*In re* IMPORTERS' & GROCERS' EXCHANGE OF NEW YORK.

*(Common Pleas of New York City and County, Special Term.* October 9, 1888.)

CORPORATIONS—DISSOLUTION—RIGHTS OF MAJORITY.

A controlling interest in a corporation, originally organized by tea dealers to foster, protect, and reform certain lines of trade, and to settle differences and promote friendly intercourse between members, and to continue 50 years, was acquired by sugar dealers, who made an application under Code Civil Proc. N. Y. § 2429, to dissolve it, on the ground that it would be "beneficial to the interests of stockholders," for the purpose of dividing the assets, which were constituted in large part of money received for shares. The later subscriptions were for a much greater amount than was paid for the original ones. The tea dealers required an exchange, and desired the continuance of the corporation. *Held*, that in the absence of a special provision, giving a majority of the members the right to it, a dissolution is not required by the Code, because beneficial to a majority, and that a dissolution should be denied.

Proceeding for the voluntary dissolution of a corporation, under Code Civil Proc. tit. 11.

*Mr. Clarke*, for petitioners.   *Frank E. Blackwell*, opposed.

LARREMORE, C. J.   This is a proceeding brought under title 11 of the Code of Civil Procedure, for the voluntary dissolution of the above-named corporation.   The Importers' & Grocers' Exchange of New York was organized under chapter 228 of the Laws of 1877, and, according to its certificate of incorporation, for the following purposes: "To foster trade and commerce in groceries and East Indian and South American products; to protect such trade from unjust and unlawful exactions; to reform abuses in such trade; to diffuse accurate and reliable information among its members; to produce uniformity and certainty in the customs and usages of the trade in said merchandise; to settle differences between the members of said corporation arising out of the trade in such merchandise; and to promote a more enlarged and friendly intercourse between merchants engaged in said trade; and generally to increase the facilities in conducting the trade in groceries and East Indian and South American products."   Said chapter 228 of the Laws of 1877 contains no provision relating to or regulating the dissolution of corporations organized under it, and, presumably, therefore, the general provisions of law are applicable.   It appears that this proceeding was regularly commenced under section 2429 of the Code, at the instance of a majority of the trustees; and the petitioners now apply, under section 2429, for a final order of dissolution, and appointing a receiver, upon the alleged ground that the same "will be beneficial to the interests of the stockholders."   From the findings of the referee, who was appointed, among other things, to determine the facts, it appears (and such fact was practically conceded on the argument) that a majority of the stockholders desire a dissolution of this corporation, and that a minority thereof are opposed to it.   Such minority does not consist merely of one or two recalcitrant members.   Those opposed to dissolution compose numerically a considerable percentage of the total number of stockholders, and, taken together, they constitute all the members engaged in the tea business. The referee has specifically found that "it is not for the interests of the members of said exchange, engaged in the tea trade, that this corporation be dissolved."

The main question to be determined is whether the words, "beneficial to the interests of the stockholders," used in section 2429, were intended to make it mandatory upon the court to decree a dissolution in cases where it would be beneficial to a majority, of the stockholders, but the best interests of the minority demand a continuation of the corporation's existence.   In my opinion, the legislature did not so intend.   The words, "beneficial to the interests of the stockholders," are somewhat vague, at best, and seem not to confer an absolute right on the stockholders; but to confide a discretionary power to the

court to order a dissolution if, in its opinion, and viewing all the circumstances of the case, the best interests of the ‚stockholders will be subserved thereby. In the exercise of such discretion the court is bound to consider the interests of the minority as well as the majority. If it appear that the members composing such minority have performed all their duties, and that, on the other hand, the majority, and those representing them, have failed to manage the company according to its charter, and that said minority desire to have such corporation continued, and to have the same managed in accordance with the plan and purposes set forth in said charter, it certainly seems to me that it is the duty of the court to guard carefully what "will be beneficial to the interests" of such minority who have acted according to the law, and desire merely the fulfillment of the implied contract, entered into by the corporation with them when they purchased membership tickets. In the absence of a provision giving a mere majority of stockholders or trustees the absolute right to a dissolution, I shall not grant the same under the admitted facts of the case at bar.

It was held in *Denike* v. *Cement Co.*, 80 N. Y. 599, that a portion of the stockholders of a manufacturing company cannot maintain an action to dissolve it; while it is said in the opinion that "all the stockholders uniting might undoubtedly surrender the franchise of a corporation, and work its dissolution." The following language used by SUTHERLAND, J., in *Abbot* v. *Rubber Co.*, 33 Barb. 578, seems to me a correct statement of the law: "I do not think the directors, even with the consent of a majority of the stockholders, had a right, as against the stockholders not consenting, thus in effect to discontinue its existence, and defeat the object of its organization. * * * To hold that the directors could thus discontinue, wind up, and defeat the purpose, object, and business for which the corporation was organized, even with the consent of a majority of the stockholders, would in effect be depriving the minority of their property without their consent. No doubt the principle that the majority must govern or control (in the absence of any special provision in the charter or constitutional articles) applies to corporations, and that the minority are bound by the acts of the majority when those acts are within and according to the charter or constitutional articles of the corporation, and not inconsistent with the object and purpose with which it was organized. Such acts a stockholder consents to by becoming a member of the corporation, because he is presumed to know the law, and the rights of the majority by law. But this democratic or representative principle does not apply to the act or acts of the majority inconsistent with a continued existence of the corporation, and the very object and purpose for which it was organized; nor does a stockholder consent to such acts by becoming a member, because the law does not justify them; and he cannot be presumed to have anticipated or thought that such acts would ever be perpetrated or attempted by the majority." See, also, *Ward* v. *Society*, 1 Colly. 370; *In re Insurance Co.*, 1 Paige, 258; *Kean* v. *Johnson*, 9 N. J. Eq. 401.

All of these decisions involved the attempted dissolution of manufacturing or commercial corporations. But although in the purpose of its organization the Importers' & Grocers' Exchange of New York is more nearly analogous to a social club than a money-making corporation, yet the principle upon which such decisions turned applies with equal force to the case under consideration. It appears that this exchange was originally organized by the so-called "tea men." Afterwards the sugar men came in in such numbers that they gained a controlling interest in its affairs. The fact, or rather expression of opinion, contained in the referee's report, that "the exchange has outlived its usefulness," is conclusively answered, so far as this application is concerned, by his further finding that, "notwithstanding there was in the treasury of said exchange over sixty thousand dollars, the trustees of said exchange refused on or about March or April, 1886, to furnish any standards of tea for

the use of members of said exchange who were dealers in tea, unless the members of the exchange would pay or subscribe therefor a sum sufficient to cover the cost thereof." It nowhere appears but that if the usual requisites for legitimate business at a commercial exchange had been provided, a brisk trade would have centered there, and abundant reason would have been found for the continuance of the corporation according to the original object of its organization. It is substantially conceded that the minority members, being the tea men, require an exchange of some sort for the conduct of their business; and, under such circumstances, it would be the height of injustice to require them to form a new company when they are already members of one started for that very purpose. The fact, which appears in one of the affidavits used on this motion, that the learned counsel for the petitioners offered to reincorporate the tea men for a comparatively small total expense, does not in any wise affect either the legal or equitable aspect of the case. The tea men joined the exchange, and paid their money for membership therein, on the faith of the provisions contained in its certificate of incorporation, and therefore, relying upon the maintenance and continuation, for a period of 50 years, of an "exchange," in the ordinary commercial sense of that word, where they could meet and engage in their legitimate business. The later subscriptions to the capital stock of the corporation were four times the original amounts paid for the same; and members who brought $1,000 shares evidently did so on the presumption that the exchange had become a fixed, and would be a permanent, institution. This is the only possible explanation of their willingness to pay the larger price for shares. They are met now in the present application by an attempt of the sugar men to dissolve the concern simply for the purpose of dividing up its assets. This disposition of the assets after such a comparatively short period of existence, would in itself work manifest injustice to those who have paid the higher price for their shares, as the money received for shares constitutes a large part of the fund now in the treasury. And this consideration is in addition to the main one above stated, that the tea men wish to act in all respects within the law, and keep to the legitimate purpose of the organization, as defined in its certificate of incorporation, and are therefore entitled to the protection of the court. The application should be denied, with costs.